**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**MEMORIAL HOSPITAL OF SOUTH BEND, *et al.*,**

    **Plaintiffs,**

        **v.**

**XAVIER BECERRA, Secretary of Health and Human Services,**

    **Defendant.**

---

Civil Action No.  20-3461 (JEB)

<u>**MEMORANDUM OPINION**</u>

In 2009, Plaintiffs Memorial Hospital of South Bend and Union Hospital appealed to the Department of Health and Human Services' Provider Reimbursement Review Board (PRRB) a determination by the Centers for Medicare and Medicaid Services (CMS) regarding the formula for the hospitals' Medicare reimbursement.  When the PRRB *sua sponte* dismissed the appeal for jurisdictional reasons, they brought suit here.  The parties have now cross-moved for summary judgment on the appropriateness of the jurisdictional dismissal.  As the Court ultimately agrees with Defendant and upholds the PRRB's decision, it will address only the jurisdictional determination and not reach the substantive reimbursement claim that formed the basis of Plaintiffs' appeal.

I.    **Background**

    A.  <u>Factual Background</u>

    Although this Opinion will not delve into the underlying merits and the reader need not commit to memory the specific reimbursement methodology, a brief detour into how healthcare

providers are paid under the Medicare Program is nonetheless valuable for understanding why this case arose and the PRRB's jurisdictional decision. CMS, a part of HHS, operates the provider-reimbursement system for Medicare patients. See ECF No. 14 (Pls. MSJ) at 2; ECF No. 16 (Def. Cross-MSJ) at 2–4. CMS, in turn, works with "Medicare Administrative Contractors" or "MACs," which are private insurance companies or other entities that compute the specific reimbursement amount each provider is to receive annually. To calculate that amount, a provider must file a cost report with its MAC at the end of each fiscal year, which the MAC then reviews. See 42 C.F.R. § 405.1801(b). After such review, the MAC must within a year "furnish the provider and other parties as appropriate . . . a written notice reflecting the contractor's final determination of the total amount of reimbursement due the provider" for that fiscal year. Id. § 405.1803(a); id. § 405.1835(c)(1) (laying out time requirements). This is known as a Notice of Program Reimbursement (NPR). See Pls. MSJ at 9.

Providers' reimbursements for providing acute inpatient care under Medicare Part A, which "covers inpatient hospital expenses and other institutional health care costs for certain individuals aged 65 years old and older, as well as certain individuals with disabilities," are based on a Prospective Payment System (PPS). See Def. Cross-MSJ at 2; 42 U.S.C. § 1395c et seq. Under the PPS model, hospitals receive a predetermined rate according to the diagnosis-related group into which each patient's condition is classified, but they may also receive payment adjustments based on certain characteristics of their facilities. See Pls. MSJ at 3; Def. Cross-MSJ at 3. One such adjustment is the "disproportionate share hospital" (DSH) adjustment, which provides a bump-up in payment to hospitals that "serve[] a significantly disproportionate number of low-income patients," since treating this group frequently incurs higher costs. See 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Whether a hospital is eligible for the DSH adjustment is

determined based on its "disproportionate patient percentage," which is calculated through the

sum of two fractions set out in 42 U.S.C. § 1395ww(d)(5)(F)(vi).  These fractions, which help

determine the share of low-income Medicare and non-Medicare patients treated by a hospital, are

the Medicare-Supplemental Security Income (SSI) Fraction and the Medicaid Fraction.  These

are best represented through their respective equations:

$$\text{Medicare-SSI Fraction} = \frac{\text{Inpatient Days for Patients Entitled to Both Medicare Part A and SSI}}{\text{Inpatient Days for Patients Entitled to Medicare Part A}}$$

$$\text{Medicaid Fraction} = \frac{\text{Inpatient Days for Patients Eligible for Medicaid but Not Medicare Part A}}{\text{Total Patient Days}}$$

See Pls. MSJ at 5; Def. Cross-MSJ at 3–4; 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I)–(II).

If that were not technical enough, the substantive dispute that led to this case revolves

around where to place days from a different category of Medicare coverage — Medicare Part C.

Part C, also known as Medicare Advantage, allows individuals eligible for Medicare to "enroll in

private health insurance plans."  Pls. MSJ at 2.  The placement of Medicare-Part-C days has been

the subject of considerable litigation because "if Part C beneficiaries are included in the

Medicaid fraction rather than the Medicare fraction, the hospitals receive a great deal more

compensation."  Allina Health Servs. v. Sebelius (Allina I), 746 F.3d 1102, 1105 (D.C. Cir.

2014).  This result arises from the fact that relatively few individuals are entitled to both

Medicare Part C and SSI.  When Medicare-Part-C days are added to the Medicare-SSI fraction,

the numerator thus does not expand nearly as much as the denominator does, with the

denominator becoming the sum of inpatient days for patients entitled to Medicare Part A and

Part C.  Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 5 (D.C. Cir. 2011).  This cuts down the

hospitals' potential DSH adjustment in a way that including Medicare-Part-C days in the

Medicaid fraction would not, since the denominator of that fraction already includes all patient days.

Significant for our case, on June 24, 2009, CMS published Medicare-SSI fractions "for every hospital in the country, including the Plaintiff Hospitals, for cost years beginning in Federal Fiscal Year 2007," and it included Medicare-Part-C days in those fractions. See Pls. MSJ at 10; see also ECF No. 24 (Joint Appendix) at 87–88 (listing fractions). Unsurprisingly, Plaintiffs were displeased by this publication, as they contend that Part C days "should not be included in either the numerator or denominator of the" Medicare-SSI fraction because Medicare-Part-C patients are not entitled to benefits under Medicare Part A. See J.A. at 2.

Dissatisfied providers can seek relief through the PRRB and they may cite several bases. First, a provider can appeal if it is "dissatisfied with a final determination of . . . [its MAC] . . . as to the amount of total program reimbursement due the provider." 42 U.S.C. § 1395oo(a)(1)(A)(i). Second, and at issue in this case, a provider can file before the PRRB if it is "dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww," which includes the DSH adjustment. Id. § 1395oo(a)(1)(A)(ii). Third, a provider may also appeal if it does not receive an NPR within a year of filing its cost report with its MAC. Id., § 1395oo(a)(1)(B); 42 C.F.R. § 405.1835(c)(1). Providers may bring their appeals individually or in a group, as was done here. See J.A. at 1. In a group appeal, the amount in controversy must be $50,000 or more in the aggregate. See 42 U.S.C. § 1395oo(b); 42 C.F.R. § 405.1837. The appeal must also be filed within 180 days after "notice of the intermediary's final determination," "notice of the Secretary's final determination," or when an NPR would have been timely received depending on the basis for the appeal. See 42 U.S.C. § 1395oo(a)(3). A decision of the PRRB is final unless it is reversed,

affirmed, or modified by the HHS Secretary within 60 days of the date the provider receives

notice of the Board's decision.  Id. § 1395oo(f)(1).  Providers then "have the right to obtain

judicial review of any final decision of the Board."  Id.

      B.  Procedural Background

On December 18, 2009, seven hospitals filed an appeal before the PRRB challenging the

Medicare-SSI ratios published by CMS on June 24, 2009.  The PRRB acknowledged the filing of

the appeal on December 24, 2009.  See J.A. 71.  In 2019, still waiting for a decision, five of the

hospitals withdrew, id. at 5, but the two Plaintiffs — Memorial Hospital of South Bend and

Union Hospital — remained.  After sitting on Plaintiffs' appeal for nearly eleven years, the

PRRB finally ruled on September 29, 2020, dismissing it for lack of jurisdiction on the ground

that the June 2009 Medicare-SSI fractions were not a "final determination of the Secretary as to

the amount of the payment" or any other final determination that could be the basis for an appeal.

Plaintiffs sought review of the PRRB's decision in this Court in November 2020.  See ECF No. 1

(Complaint).

## II.   Standard of Review

Both parties here have moved for summary judgment on the administrative record.  See

Pls. MSJ at 1; Def. Cross-MSJ at 25.  Although brought as summary-judgment motions, the

standard set forth in Federal Rule of Civil Procedure 56(c) does not apply to these claims

because of the limited role of a court in reviewing the administrative record.  See Sierra Club v.

Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d

25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court

is to determine whether or not as a matter of law the evidence in the administrative record

permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d. at 90 (quotation

marks and citations omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010).

Here, because Plaintiffs "challenge[] the PRRB's determination that it lacks jurisdiction over an issue," the Court's summary-judgment review must be "'limit[ed] . . . to the PRRB's jurisdiction determination' and not reach the merits of the claim."  Clarian Health W., LLC v. Burwell, 206 F. Supp. 3d 393, 405 n.13 (D.D.C. 2016), rev'd and remanded sub nom. Clarian Health W., LLC v. Hargan, 878 F.3d 346 (D.C. Cir. 2017) (quoting Eagle Healthcare, Inc. v. Sebelius, 969 F. Supp. 2d 38, 45 (D.D.C. 2013)); see also Good Samaritan Hosp. Reg'l Med. Ctr. v. Shalala, 85 F.3d 1057, 1062 (2d Cir. 1996) ("[B]ecause the only final decision reached by the PRRB was that it lacked jurisdiction to review Empire's reopening denials, the district court was limited to reviewing this decision and did not have jurisdiction to review the merits of Empire's reopening decisions.").  In other words, the Court will not address the ratios themselves; rather, it will examine only whether the PRRB's jurisdictional determination satisfies the judicial-review provisions of the APA, 5 U.S.C. § 706, which are incorporated into the Medicare statute.  See 42 U.S.C. § 1395oo(f)(1).

The Court ultimately must "hold unlawful and set aside" the PRRB's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Under this "narrow" standard of review, "a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Rather, courts "will defer to the [agency's] interpretation of what [a statute] requires so long as it is 'rational and supported by the record.'"  Oceana, Inc. v. Locke,

670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1994)).

An agency must "examine the relevant data and articulate a satisfactory explanation for its action." State Farm, 463 U.S. at 43. For that reason, courts "'do not defer to the agency's conclusory or unsupported suppositions,'" United Techs. Corp. v. U.S. Dep't of Def., 601 F.3d 557, 563 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. U.S. Dep't of the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not entitled to deference when they are merely [agency] counsel's '*post hoc* rationalizations' for agency action, advanced for the first time in the reviewing court." Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 156 (1991). The reviewing court thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285–86 (1974) (citation omitted). A decision that is not fully explained may, nevertheless, be upheld "if the agency's path may reasonably be discerned." Id. at 286.

When reviewing an agency's interpretation of a law it administers, a court must apply the principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); Se. Ala. Med. Ctr. v. Sebelius, 572 F.3d 912, 916 (D.C. Cir. 2009). Under Chevron, the first step is to "examine the statute *de novo,* 'employing traditional tools of statutory construction.'" National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quoting Chevron, 467 U.S. at 843 n.9); see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007) (court begins by "applying customary rules of statutory interpretation"). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress."  Chevron, 467 U.S. at 842–43; see also Eagle Broadcasting Group, Ltd. v. FCC, 563

F.3d 543, 552 (D.C. Cir. 2009) (if the "search for the plain meaning of the statute . . . yields a

clear result, then Congress has expressed its intention as to the question, and deference is not

appropriate") (internal citation and quotations omitted); Arkansas Dairy Co-op Ass'n, Inc. v.

U.S. Dep't of Agr., 573 F.3d 815, 829 (D.C. Cir. 2009) (no deference due where agency's

construction is "contrary to clear congressional intent").

 If, however, "the statute is silent or ambiguous with respect to the specific issue,"

Chevron, 467 U.S. at 843, the analysis proceeds to "determine the deference, if any, [the court]

owe[s] the agency's interpretation of the statute."  Mount Royal Joint Venture, 477 F.3d at 754.

Under this step, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express

delegation of authority to the agency to elucidate a specific provision of the statute by regulation.

Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or

manifestly contrary to the statute."  Chevron, 467 U.S. at 843–44.  Where a "legislative

delegation to an agency on a particular question is implicit rather than explicit," id. at 844, a

court must uphold any "'reasonable interpretation made by the administrator' of that agency."

Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 356 (D.C. Cir. 1993) (quoting Chevron, 467 U.S. at

844).

**III. Analysis**

 In reviewing the PRRB's dismissal for lack of jurisdiction, this Court must answer a

straightforward question: was the publication of Medicare-SSI fractions by CMS on June 24,

2009, a "final determination of the Secretary as to the amount of the payment" to be received?  If

so, then the PRRB did have jurisdiction and erred in its dismissal; if not, its decision was correct.

The PRRB relied on two reasons.  First, as it explained, the publication of the Medicare-SSI

fractions "cannot be considered a final determination as CMS immediately rescinded those percentages and the action to rescind occurred well before this appeal being filed." J.A. at 3. Those fractions were thus never actually used to calculate Plaintiffs' DSH adjustment. Id. Second, CMS's publication was only "provid[ing] updated data for determining the disproportionate share adjustment for IPPS [Inpatient Prospective Payment System] hospitals . . . and, as such, was not itself a final determination." Id. (internal quotation marks and citations omitted).

The Government maintains that the Board's dismissal should be affirmed as it was based on "the correct interpretation of the Medicare statue" under either Chevron Step One or Step Two, and that the decision was not arbitrary and capricious. See Def. Cross-MSJ at 9. Plaintiffs counter that the published Medicare-SSI fractions did provide them with a final decision on payment amounts since those fractions had to be used in calculating their disproportionate patient percentage, which in turn affects the amount of their DSH adjustment and ultimate payment. See Pls. MSJ at 18. This Opinion will begin with an analysis under Step One of Chevron before proceeding briefly to Step Two and the other issues remaining in the case.

A.  Chevron Step One

The Chevron analysis first "requires the court to consider 'whether Congress has spoken to the precise question at issue.'" Affinity Healthcare Servs., Inc. v. Sebelius, 746 F. Supp. 2d 106, 114 (D.D.C. 2010) (quoting Chevron, 467 U.S. at 842). It is clear from the text of the statute and traditional tools of statutory interpretation that the June 2009 Medicare-SSI fractions are not within the scope of decisions Congress intended for § 1395oo(a)(1)(A)(ii) to cover, as the fractions are neither final nor a determination as to the amount of payment for the reasons described below.

1. *Final Determination*

Although there is not a subsection of the Medicare statute explicitly defining what constitutes "a final determination of the Secretary as to the amount of the payment" under 42 U.S.C. § 1395oo(a)(1)(A)(ii), both the PRRB and the Government argue that the Medicare-SSI fractions at issue could not possibly be considered "final" because CMS rescinded them shortly after publication.  Indeed, CMS announced updated Medicare-SSI data on July 24, 2009, the very next month.  See ECF No. 19 (Pls. Reply); CMS, CMS Pub. 100-04 Claims Processing (July 24, 2009), https://go.cms.gov/3J2CInD.  Then, one week later, MACs were told "not to issue final settlements for the fiscal year 2007 using the 2007 SSI ratios."  J.A. at 2; Pls. Reply at 3.  The June 2009 fractions had thus already been rescinded well before Plaintiffs brought their case to the PRRB that December.  See Def. Cross-MSJ at 10.  The process for calculating the Medicare-SSI fractions, moreover, was revised yet again a year later when CMS released an administrative ruling and proposed rule laying out changes to the process for matching data in calculating the Medicare-SSI fractions.  See CMS, CMS Ruling 1498-R, 2010 WL 3492477 (Apr. 28, 2010), 6–7; 75 Fed. Reg. 23,852 (May 4, 2010); see also J.A. at 2.  Finally, as the PRRB and Defendant explain, "On March 16, 2012, CMS posted revised SSI percentages on the website," and those were the fractions that were ultimately used in the calculations of Plaintiffs' payments.  See J.A. at 3; Def. Cross-MSJ at 10.  Plaintiffs do not dispute that revised Medicare-SSI ratios were published in March 2012 and used in the relevant NPRs for their hospitals, which were published in November 2012.  See Pls. Reply at 3, 13.

Defendant thus argues that given this history of revision, the Medicare-SSI fractions published on June 24, 2009, could not possibly have been final since, as the PRRB concluded, "[T]here is no evidence that those SSI percentages were ever used in calculating the Participants'

DSH adjustment for the year at issue." J.A. at 3; see also Def. Cross-MSJ at 11–13. Considering that the June 2009 Medicare-SSI fractions had already been updated in the months prior to Plaintiffs' appeal before the PRRB, the Court concurs that the challenged publication clearly was not "the end result of a succession or process" and "not to be changed or reconsidered." Final, The American Heritage Dictionary of the English Language (3d ed. 1992) (published nine years after "final determination of the Secretary" language introduced); see also Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (final agency action "must mark the 'consummation' of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature," and it must also be an action "by which rights or obligations have been determined, or from which legal consequences will flow") (internal quotation marks and citations omitted). Indeed, when other courts in this district have found that jurisdiction was proper under § 1395oo(a)(1)(A)(ii), they have noted that the secretarial determination at issue explicitly indicated that the payment rate "cannot be revised." Abbott-Nw. Hosp. v. Leavitt, 377 F. Supp. 2d 119, 127 (D.D.C. 2005).

Plaintiffs respond that this is too technical a definition of "final"; instead, they cast their claim about the June 2009 Medicare-SSI fractions as a challenge to "the Secretary's inclusion of the Medicare Part C Days in the SSI fraction." Pls. Reply at 9. In filing their appeal, Plaintiffs told the PRRB that the common issue they sought to address was the "erroneous inclusion of inpatient days attributable to Medicare Advantage [Medicare Part C] patients." J.A. at 89. This, they argue, constitutes a final determination about how to calculate the amount of payment that providers receive since "none of [the subsequent CMS] changes cited by the Board changed the decision of the Secretary to include Part C days in the calculation of the SSI fraction," even if the specific "cost reports for the Hospitals were subject to change in the DSH adjustment." Pls. MSJ

at 19.  Via this broader definition, Plaintiffs maintain that they in fact challenged a final determination.

Defendant responds that this argument founders for several reasons.  First, the Government points out that whatever Plaintiffs now claim they were challenging, they told the PRRB that "[t]he final determination being appealed is the publication of the FY 2007 SSI Rates on June 24, 2009," J.A. at 89; ECF No. 23 (Def. Reply) at 4, and they attached a "data file containing SSI ratios . . . for more than three thousand hospitals" without any policy statement regarding Medicare-Part-C days.  See J.A. 87–88; Def. Reply at 4–5.  This position, however, arguably places too much weight on the exact determination challenged.  The PRRB clearly knew that what concerned the hospitals was the placement of Medicare-Part-C days into either the Medicare-SSI fraction or the Medicaid fraction.  See J.A. at 1 ("This appeal involves multiple Providers' appeals for the issue of the inclusion of Medicare Advantage [another name for Part C] days in the calculation of the 2007 Supplemental Security Income ('SSI') Ratios.").  Although Plaintiffs did not challenge a final rule or other policy-setting document focused exclusively on the placement of Part C days, that alone is not enough to undermine their counterargument.

More compelling is the Government's next rebuttal: it does not matter if Plaintiffs specifically challenged the Medicare-Part-C days decision in the June 2009 publication because an interim decision is not rendered final simply by the fact that it remains unchanged throughout later revisions.  Consider the case in which an agency issues a Notice of Proposed Rulemaking and later issues a Final Rule.  Even if many aspects of the rule stay the same between the issuance of the NPR and the Final Rule — which presumably often occurs — that does not transform the NPR into the appropriate vehicle to challenge those unchanged aspects.  In re Murray Energy Corp., 788 F.3d 330, 335 (D.C. Cir. 2015) (holding that while "EPA ha[d]

repeatedly and unequivocally asserted" it had certain legal authority including in memo and preamble of proposed rule, "those EPA statements are not final agency action"). Finality still requires that the action "mark the 'consummation' of the agency's decisionmaking process" and be an action "by which 'rights or obligations have been determined.'" Bennett, 520 U.S. at 177–78 (citations omitted). The June 2009 publication of the Medicare-SSI fractions did not meet either of these requirements with respect to the decision on placement of Medicare-Part-C days or even as to the values of the hospital-specific fractions themselves, which were later revised.

The June 2009 fractions were neither the first nor the last instance in which the Medicare-Part-C policy was articulated, and it is not clear why Plaintiffs picked them as the basis for their challenge. As Defendant notes, in the June publication, "CMS was simply applying the policy that was in effect at the time as stated in the fiscal year 2005 IPPS final rule." Def. Reply at 5; see also 69 Fed. Reg. 48,916, 49,099 (Aug. 11, 2004) ("adopting a policy to include the patient days for [Medicare-Part-C] beneficiaries in the Medicare fraction" and revising their regulations accordingly); Pls. MSJ at 6–8 (discussing 2004 policy change and change in regulatory language in August 2007 final rule). Regardless of when the policy was first announced, the June 2009 Medicare-SSI fractions were not a final decision as to Medicare-Part-C days under the plain meaning of 42 U.S.C. § 1395oo(a)(1)(A)(ii), as they were not the end of CMS's policymaking process and subject to no further revision. The PRRB thus lacked jurisdiction over Plaintiffs' appeal.

This determination is not undermined by two recent opinions of this Circuit that addressed the inclusion of Medicare-Part-C days in the Medicare-SSI fraction, including through a challenge to fractions published by CMS. See Allina Health Servs. v. Price (Allina II), 863 F.3d 937, 939–40 (D.C. Cir. 2017), aff'd sub nom. Azar v. Allina Health Servs., 139 S. Ct. 1804

(2019); Allina I, 746 F.3d 1102.  In both cases, the plaintiffs originally appealed to the PRRB

under different theories of jurisdiction than that relied on here.  See Allina Health Servs. v.

Sebelius, 904 F. Supp. 2d 75, 83 (D.D.C. 2012), aff'd in part, rev'd in part 746 F.3d 1102

(providers in Allina I appealed intermediary's NPR calculation under 42 U.S.C.

§ 1395oo(a)(1)(A)(i), which allows for appeals of MAC's decision as "to the amount of total

program reimbursement due the provider"); No. 14-1415, ECF No. 1, ¶¶ 38–39 (providers in

Allina II appealed to PRRB under 42 U.S.C. § 1395oo(a)(1)(B), which permits appeal if NPR

has not been filed within required timeframe).  In Allina II, the PRRB then found that it had

jurisdiction over the matter but was "without authority to decide [the] particular question" and so

granted expedited judicial review.  See 863 F.3d at 940–941 (internal citations and quotation

marks omitted).  Similarly in Allina I, the PRRB granted expedited judicial review as it noted

that this was a situation where "it has jurisdiction but does not have the authority to decide a

question of law, regulation, or CMS ruling."  Allina Health Serv. v. Sebelius, No. 10-1463, ECF

No. 42-1 (Joint Appendix) at ECF p. 8.

The Court, consequently, concludes that the hospitals were not appealing a final

determination of the Secretary.

### 2.  *Amount of Payment*

There is a separate and independent basis for upholding the PRRB's decision: the

challenged Medicare-SSI fractions were not a "determination of the Secretary as to the amount

of the payment" — the only category of secretarial determinations over which Congress gave the

PRRB jurisdiction.  Recall that 42 U.S.C. § 1395oo(a)(1)(A)(ii) allows a case to be brought

before the PRRB if a provider "is dissatisfied with a final determination of the Secretary as to the

amount of the payment under subsection (b) or (d) of section 1395ww," which includes the

disproportionate share reimbursement.  Id. (emphasis added).  In dismissing Plaintiffs' appeal,

however, the PRRB noted that what was at issue was only "data for determining the disproportionate share adjustment.'" J.A. at 3 (quoting Transmittal 1744, which updated the June 2009 publication) (emphasis in original). That is not the same thing.

As Defendant explains, the publication of Medicare-SSI fractions, even if final, cannot be a determination as to the amount of payment since the fractions "are but one component used to calculate a hospital's DSH adjustment." Def. Cross-MSJ at 10. From just the Medicare-SSI fraction it cannot even be determined whether "a hospital is entitled to any DSH adjustment, let alone the amount of that DSH adjustment," since a provider must first clear a threshold based on the sum of its Medicare-SSI and Medicaid fractions to be eligible to receive the adjustment. Id.; cf. Baystate Med. Ctr. v. Leavitt, 545 F. Supp. 2d 20, 57 (D.D.C. 2008), amended in part, 587 F. Supp. 2d 37 (D.D.C. 2008) (suggesting, but not deciding, that inclusion of days that could "deflate[] the SSI fraction" would affect the "amount of the payment"). As a result, the determination as to whether a provider "is entitled to a DSH adjustment and, if so, how much . . . it will be is made by the MAC 'at the time of the year-end settlement of its cost report'" and after the hospital has submitted the relevant data. See Def. Cross-MSJ at 12 (citing 51 Fed. Reg. 31,454, 31,458–59 (Sept. 3, 1986)).

Plaintiffs, however, counter that the Medicare-SSI fractions do affect the amount paid to them because the fractions that CMS provides — and in turn whatever method CMS adopts to determine those fractions — must be used in calculating their disproportionate patient percentages, which in turn affects their reimbursement. See Pls. Reply at 2; see also Allina II, 863 F.3d at 943 ("Fiscal intermediaries are commanded to use HHS's Medicare fractions in calculating adjustment amounts."). Indeed, if the amount of payment to Plaintiffs was not substantial, there would likely be no case before this Court.

The difference between the parties boils down to a dispute about whether Plaintiffs have conflated a determination by the Secretary about <u>one of several undetermined elements</u> that eventually flows into the amount of payment and "a final determination of the Secretary as to <u>the amount of the payment</u>." 42 U.S.C. § 1395oo(a)(1)(A)(ii). A challenge to an element of payment under 42 U.S.C. § 1395oo(a)(1)(A)(ii) is only appropriate if, as the D.C. Circuit has explained, "the Secretary ha[s] firmly established '<u>the only variable factor</u> in the final determination as to the amount of payment under § 1395ww(d).'" <u>Monmouth Med. Ctr. v. Thompson</u>, 257 F.3d 807, 811 (D.C. Cir. 2001) (quoting <u>Washington Hosp. Ctr. v. Bowen</u>, 795 F.2d 139, 147 (D.C. Cir. 1986)) (emphasis added); <u>see also</u> <u>Samaritan Health Serv. v. Sullivan</u>, 1990 WL 33141 at *3 (9th Cir. 1990) (unpublished table decision) ("We have held that if the Secretary's classification of a hospital effectively fixes the hospital's reimbursement rate, then that decision is a 'final determination' as referred to 42 U.S.C. § 1395oo(a)(1)(A)(ii).").

Here, Defendant posits that Plaintiffs should have waited until they received an NPR to bring their case since "the NPR is the only relevant final DSH payment determination." Def. Cross-MSJ at 15. Plaintiffs counter that precedent from the Circuit courts makes clear that a provider need not always wait for an NPR to appeal; otherwise, an appeal under § 1395oo(a)(A)<u>(ii)</u> would be coterminous with a challenge to "a final determination of the [MAC] . . . as to the amount of total program reimbursement" brought after submitting a year-end cost report under 42 U.S.C. § 1395oo(a)(A)<u>(i)</u>. See Pls. Reply at 7.

It is true that these two types of appeal are not coterminous, and Plaintiffs correctly identify several cases where providers brought cases under 42 U.S.C. § 1395oo(a)(A)(ii) and did not have to wait for an NPR before appropriately challenging a final secretarial determination. In those cases, however, jurisdiction was proper under § 1395oo(a)(A)(ii) because the secretarial

determination at issue was either the only determination on which payment depended or clearly promulgated as a final rule.  See Cape Cod Hospital v. Sebelius, 630 F.3d 203 (D.C. Cir. 2011); Sunshine Health Sys., Inc. v. Bowen, 809 F.2d 1390 (9th Cir. 1987); Washington Hosp. Ctr., 795 F.2d 139.  Although Plaintiffs also brought their challenge under § 1395oo(a)(A)(ii), the circumstances that made jurisdiction proper under that subsection are not present here.

      In Washington Hospital Center, for example, the D.C. Circuit explained that Congress had clearly intended to create two distinct appeals processes — one under 42 U.S.C. § 1395oo(a)(A)(i) for challenges to a MAC's determination of total program reimbursement and one under 42 U.S.C. § 1395oo(a)(A)(ii) to challenge the amount of payment determined by the Secretary under the at-the-time newly introduced Prospective Payment System for Medicare. See 795 F.2d at 145.  The two processes were not the same because under PPS, "payment amounts are independent of current costs and can be determined with finality prior to the beginning of the cost year[;] . . . [thus] the appeals provision applicable to PPS recipients cannot be read to require hospitals to file cost reports and await NPRs prior to filing a PRRB appeal." Id. at 146.  In other words, because the complete payment amounts could be finally determined before hospitals submitted cost reports, the alternate basis for appeal, 42 U.S.C. § 1395oo(a)(A)(ii), was available.

      Similarly, Sunshine Health Systems also dealt with whether a challenge was appropriately brought to a final determination of the Secretary or whether additional cost information was required when a hospital challenged a letter finding that it was a new hospital for purposes of the PPS.  The Ninth Circuit held that this was a final determination because, as a new hospital, the payments it received under the relevant scheme "would be calculated solely on the basis of the fixed standardized cost averages," and additional information on the hospital's

actual costs was not required.  See 809 F.2d at 1396.  Indeed, the "amount of the payment" in § 1395oo(a)(1)(A)(ii) is framed in terms of prospective payments hospitals are to receive — which can be determined with finality in advance of payment — rather than, as here, data as to the number of patient days a hospital actually accrued during a particular period.  See Washington Hosp. Ctr., 795 F.2d at 147 (amount of payment "is the sum of a [diagnosis-related group] per-patient rate and a target amount per patient" in contrast to "total program reimbursement . . . for the period covered by [the cost] report," which is appealed under 42 U.S.C. §§ 1395oo(a)(1)(A)(i)); St. Francis Hosp. v. Bowen, 802 F.2d 697, 700–01 (4th Cir. 1986) (amount of payment defined in terms of rates and designed to give prospective information).

Cape Cod Hospital, which Plaintiffs rely on as an example of a final secretarial determination filed prior to a cost report, also presented distinct circumstances as the plaintiff hospitals challenged two final rules promulgated by CMS that governed the wage indexes for rural hospitals receiving Medicare payments.  See 630 F.3d at 208.  The fact that these rules were the culmination of the notice-and-comment procedure already distinguishes them from the fractions at issue here; in addition, the rules in Cape Cod Hospital were also appealed to the Circuit under a different posture.  There the PRRB found that "it lacked authority to resolve the legal questions presented by the hospitals," not that it lacked jurisdiction.  Id. at 209.

There thus remain instances in which a provider can appropriately challenge "a final determination of the Secretary as to the amount of the payment" under § 1395oo(a)(1)(A)(ii) before it has received an NPR.  Unfortunately for Plaintiffs, this is not such an instance.  The Medicare-SSI fraction is just one of the variables that determines whether hospitals receive a

DSH payment and, if so, for how much.  The publication of these fractions for FY 2007 was not

a determination as to the amount of payment received.

B.  Chevron Step Two

Even if the Secretary did not prevail at Chevron Step One, the Court would find him the

victor at Step Two.  Put another way, even if the statute were found to be "silent or ambiguous

with respect to the specific issue" of what constitutes a "final determination of the Secretary as to

the amount of the payment" under 42 U.S.C. § 1395oo(a)(1)(A)(ii), the Court would still uphold

the PRRB's decision as it is based on the Secretary's reasonable interpretation of that section of

the statute.  Chevron, 467 U.S. at 843.  The Secretary has consistently found that disputes about

the receipt or amount of DHS payments can only be appealed after issuance of an NPR by a

MAC, which suggests that the component parts of a DSH payment such as the Medicare-SSI

fraction are not final secretarial determinations.  This interpretation is laid out in the 1986

Inpatient Prospective Payment System final rule stating that "final determination of a hospital's

eligibility for, and amount of, any disproportionate share adjustment will be made by the fiscal

intermediary at the time of the year-end settlement of its cost report."  51 Fed. Reg. at 31,458.

This view was reiterated in 2015, after Plaintiffs filed their appeal.  See 80 Fed. Reg. 70, 298, 70,

570 (Nov. 13, 2015) ("[T]he PPS payment adjustment for hospitals that serve a significantly

disproportionate share of low income patients is determined on the basis of information about

patients' eligibility for Medicaid benefits and their entitlement to [SSI benefits;] . . . this

information is properly included in the hospital's cost report for such period.").

Here, the Secretary's implicit determination that CMS's publication of the Medicare-SSI

fractions could not be a "final determination . . . as to the amount of the payment" was

reasonable on the grounds previously described.  Since the DHS adjustments are based at least in

part on the cost reports submitted by hospitals, it is reasonable for the Secretary to conclude that

challenges to those payments should occur only after an NPR has been issued or a final rule

governing the adjustment process is released.  The Court must uphold any "reasonable

interpretation made by the administrator of an agency," Chevron, 467 U.S. at 844; as a result,

even if had not found that the statute clearly addressed the issue at hand, the Court would still

affirm the PRRB's jurisdictional decision as it is based on a reasonable interpretation by HHS of

the relevant section of the Medicare statute.

    C.  Other Issues

    The Court briefly addresses the hospitals' few remaining concerns.

        1.  *Adequate Explanation of PRRB's Decision*

    Although not expressly raised by Plaintiffs, Defendant asserts that the PRRB adequately

explained its decision to dismiss for lack of jurisdiction.  See Def. Cross-MSJ at 20–23.  The

Court concurs.  The Board's opinion lays out, albeit with relative concision, several reasons why

it concluded that the June 2009 publication of the Medicare-SSI fractions was not a "final

determination."  J.A. at 1–3.  As discussed above, shortly after publishing these fractions, CMS

reversed course and instructed that they should not be used.  Id. at 2.  The Board also explained

that in addition to being non-final, Plaintiffs had challenged the publication of data used with

other information to calculate the amount of payment, but not the amount of payment itself.  Id.

at 2–3.  Based on the reasoning in the PRRB's decision, the Court concludes that the Board has

"articulate[d] a satisfactory explanation" for its jurisdictional dismissal, State Farm, 463 U.S. at

43, as there is a "rational connection" between the facts found regarding the nature of the June

2009 Medicare-SSI fractions and the decision that the fractions did not constitute a final

determination of the Secretary.  Id.  There is also no indication, and Plaintiffs do not even argue,

that the PRRB ignored relevant arguments as to whether it had jurisdiction over Plaintiffs' claims or considered material that it should not have.  Id.

### 2. *PRRB's Delay*

Plaintiffs also contend that the PRRB's delay stymied them from pursuing relief in other ways.  The hospitals were no doubt exceedingly frustrated by waiting eleven years for a resolution of their appeal, only to have it *sua sponte* dismissed by the PRRB.  The Board could certainly have acted with greater alacrity, but no matter its pace, the PRRB was still obligated to determine if it had jurisdiction and, if not, to "dismiss[] the appeal," as it did here.  See 42 C.F.R. § 405.1840(c)(2); id. at § 405.1840(a)(4).  Plaintiffs argue that jurisdictional issues could have been raised earlier — such as when the PRRB acknowledged receipt of the appeal in 2009, see Pls. MSJ at 10; J.A. at 70–73 — and that they could have been allowed to brief the jurisdictional issue prior to dismissal.  See Pls. MSJ at 18.  They also note that the MAC told the PRRB when the case was initially filed that "no jurisdictional impediments exist for these providers."  Pls. MSJ at 11 (quoting J.A. at 12).  While the hospitals may feel sandbagged, the PRRB's rules explicitly state that "[a]n acknowledgement does not limit the Board's authority. . . to dismiss the appeal if it is later found to be jurisdictionally deficient."  CMS, PRRB Rule 9 (Aug. 29, 2018), https://go.cms.gov/3vEW0LW.  And the Board's acknowledgement of receipt was purely procedural and did not address the merits of the appeal.  The Board, moreover, is allowed to "review jurisdiction on its own motion at any time."  CMS, PRRB Rule 4.1 (Aug. 29, 2018), https://go.cms.gov/3vEW0LW.  There was thus nothing improper about its dismissing the hospitals' claims on its own motion, although it admittedly could have done so sooner.

The fact that the Board's delay prevented Plaintiffs from pursuing an alternate appeal under § 1395oo(a)(1)(A)(i) once they received their NPRs is also not a reason for this Court to

overturn the Board's jurisdictional decision.  As Plaintiffs explain, "The last NPR [relevant to this case] was issued on November 29, 2012," to Union Hospital, see Pls. MSJ at 13, from which the hospital then had 180 days to appeal to the PRRB, creating a final deadline in May 2013.  Id. Plaintiffs did not appeal then, presumably because the PRRB appeal underlying this case was pending and they thought it would be resolved relatively promptly.  It is true that "[h]ad the Board reached" its jurisdictional decision "in a more diligent matter, . . . Providers would not have been prejudiced by the PRRB's delay," since they "could have simply filed within 180 days" of issuance of their NPRs.  Id.  But nothing prevented them from doing so either by filing a new case before the PRRB under § 1395oo(a)(1)(A)(i) or by amending their existing one while their original case was pending.  Nor do they "explain why they took no action to preserve their appeal" during this time.  See Def. Reply at 13.  The Court thus cannot find that the PRRB's delay is a basis to hold the jurisdictional dismissal unlawful.

### 3.  *Alternative Avenue for Appeal by Memorial Hospital*

Plaintiffs last posit that "[w]ith specific regard to Memorial Hospital, the Board's dismissal was [also] improper" because the PRRB separately had jurisdiction under 42 U.S.C. § 1395oo(a)(1)(B), which governs appeals from untimely filings of NPRs.  See Pls. MSJ at 19. Memorial maintains that jurisdiction exists under this subsection because it "filed its cost report with the MAC on July 1, 2008," but "did not receive an NPR or other determination on the cost report before July 1, 2009," as required by regulation.  Id.; see also 42 C.F.R. § 405.1835(c)(1) (NPR untimely if not filed within one year of final cost report).  Since Memorial filed its appeal before the PRRB on December 18, 2009, which was "within 180 days of" the deadline by which it should have received its NPR from the MAC, it concludes that the PRRB had jurisdiction over

its appeal styled as a § 1395oo(a)(1)(B) claim.  See Pls. MSJ at 19–20; 42 U.S.C. § 1395oo(a)(3)

(filing deadline for delayed-NPR appeals).

Defendant initially disputes whether Memorial actually filed its cost report in July 2008,

see Def. Cross-MSJ at 22, but the filing time is ultimately irrelevant because Memorial never

sought jurisdiction on the basis of an untimely NPR.  Id.  Rather, in filing its appeal, Memorial

stated that "[t]he final determination being appealed is the publication of the FY 2007 SSI Rates

on June 24, 2009."  J.A. 89.  It made no reference to the delayed receipt of its NPR.  Although

Memorial could likely have sought jurisdiction on this alternate basis, it nowhere indicated that it

was so doing, as was required by regulation.  See 42 C.F.R. § 405.1837(c)(3) (in group appeal

providers must offer "[a] copy of each final contractor or Secretary determination under appeal,

and any other documentary evidence the providers consider to satisfy the hearing request

requirements . . . and a precise description of the one question of fact or interpretation of law,

regulations, or CMS Rulings that is common to the particular matter at issue in the group

appeal.").  It cannot now assert a *post hoc* alternative basis for jurisdiction.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Summary Judgment

and grant Defendant's Cross-Motion for Summary Judgment.  A separate Order will issue this

day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  March 25, 2022